UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re<br><br>**GEORGE J. SEBESTA,**<br><br>　　　　　　　**Debtor**<br><br>**PETER CRANE,**<br><br>　　　　　　　**Plaintiff**<br><br>v.<br><br>**GEORGE J. SEBESTA,**<br><br>　　　　　　　**Defendant** | **Chapter 7**<br>**Case No. 07-10089**<br><br><br><br>**Adversary Proceeding**<br>**No. 07-01315** |

## MEMORANDUM OF DECISION

**I.      Overview**

By his complaint in this adversary proceeding, plaintiff Peter Crane ("Crane") seeks a determination that his unliquidated claims against the defendant and debtor, George Sebesta ("Sebesta"), are excepted from discharge under 11 U.S.C. § 523(a)(2)(A) as a debt arising from false representations. The claims arise from a failed joint venture in which the parties agreed to develop and sell certain real property owned by Sebesta and share the profits. The venture was plagued by poor planning and management, long delays, cost overruns, deficient workmanship, and a downturn in the real estate market, resulting in a total loss to both parties. After a trial, the Court now makes the following finds and rulings and, on the basis thereof, concludes that the Crane has not established cause to except his claims from discharge.

**II.     Procedural History**

On June 5, 2007, Sebesta filed a petition for relief under Chapter 7 of the Bankruptcy Code, commencing the present bankruptcy case. At the time, Crane had filed a complaint against him state court for relief arising from their failed venture. The precise nature of those

claims is nowhere in evidence. Upon the filing of Sebesta's bankruptcy petition, the state court action, which was then still pending, was automatically stayed. In due course, Sebesta received a discharge under Chapter 7 of the Bankruptcy Code.

Crane timely filed the complaint commencing this adversary proceeding. The complaint seeks a determination that his prepetition claims against Sebesta are excepted from discharge under 11 U.S.C. § 523(a)(2)(A) and (a)(4).[1] The complaint specifies three separate fraudulent statements that might form the basis of exception from discharge under subsection (a)(2)(A). The complaint further alleges in conclusory fashion that his claims also should be excepted from discharge under subsection (a)(4) as debts arising from fraud while acting in a fiduciary capacity, defalcation while acting in a fiduciary capacity, larceny, and embezzlement. However, the complaint does not specify the facts and theories on which Crane is relying to establish nondischargeability under subsection (a)(4). Crane did not rectify this problem in the parties' Joint Pretrial Memorandum. Also, the proposed findings and conclusions that he submitted after trial included no proposed findings or rulings as to counts under subsection (a)(4), no briefing as to those counts, and no reference at all to subsection (a)(4). Therefore, although Crane has not expressly said so, he appears to have withdrawn his demands under subsection (a)(4). In any event, they are now deemed waived.[2]

The Court held a one-day trial on the nondischargeability counts. The parties then filed posttrial briefs, whereupon the matter was taken under advisement. The following constitute the Court's finding of fact and rulings of law under FED. R. CIV. P. 52(a).

---

[1] The complaint also seeks a determination of liability on the prepetition claims; and Sebesta articulated counterclaims against Crane for liability arising from the same failed venture. Earlier in the adversary proceeding, the court issued an order of abstention as to the liability counts. The matter is before the Court now solely on counts for determination of dischargeability.

[2] The counts under (a)(4) require articulation of theories on the basis of which the court could find either that Sebesta held certain property in a fiduciary capacity for Crane or for their joint venture or that Crane or the joint venture had a property interest in the same property. Neither proposition here is self-evident. It is not the role of the Court to guess at theories on which Crane may be relying. Also, where Crane has not articulated the needed theories, Sebesta has had no notice of the theories against which he must defend.

III.    **Findings of Fact**

In 2004, Sebesta, a home improvement contractor, along with his live-in girlfriend, Susan Oiestad, purchased two adjacent lots in the town of South Dartmouth, Massachusetts: 41 Wilson Street ("Wilson Street Property") and 562 Elm Street ("Elm Street Property").  On the Wilson Street Property stood a house which Sebesta and Oiestad and their children intended to and, after the purchase, did occupy as their residence.  The Elm Street Property was a vacant lot.  They purchased both properties together from the prior owners of the properties, Leonard and Madelyn Gonsalls, for a total of $680,000.  In the transaction, the Gonsalls took back a mortgage covering both lots.  The precise amount of the Gonsalls' mortgage at the time of its origination is not in evidence.  Sebesta and Oiestad's intent upon purchasing the Elm Street Property was to build a home on it, then sell that property and use the proceeds to pay down their mortgage debt on 41 Wilson Street.

During the summer of 2004, Crane met Sebesta on the little league field where their sons played ball together.  Crane was a middle school math teacher and football coach who also had a side business selling modular homes.  His experience with modulars was limited; by the commencement of this process, he had sold no more than five, maybe only three (Crane's testimony was inconsistent on this point).  In each instance, he himself had been responsible for overseeing the installation of the modular home on its site.  It is unclear whether he had ever been responsible for overseeing and completing the further work necessary to obtain a certificate of occupancy for the home.  Depending on the home, the necessary additional work could be considerable.

Crane and Sebesta discussed the possibility of joining together as business partners to develop and sell the Elm Street Property.  In November 2004, they finalized the terms of an agreement for that purpose.  The terms they agreed upon were as follows:  (i) Sebesta would contribute the Elm Street Property, for which he would receive payment from the sale proceeds of $325,000; (ii) Crane would contribute the modular home; (iii) Crane would provide the funds

3

necessary to finish and sell the home; (iv) from the proceeds, each party would be reimbursed for the expenses each incurred to bring the project to completion; and (v) after payment of $325,000 to Sebesta for the property and each party's expenses, the parties would share the profits equally. In April 2005, they further agreed that their business would take the form of a limited liability corporation, to be known as Padanaram Development Co, LLC, in which each would hold half of the equity, but they never completed and filed the paperwork necessary to create the LLC.[3] They memorialized their business agreement, or at least parts of it, in a written but undated agreement entitled "Padanaram Development Company LLC Agreement on 562 Elm St. South Dartmouth Project." In its entirety, it states:

> The following agreement is for Padanaram Development Co., LLC (PDC). The company was formed as a partnership between Peter Crane and George Sebesta. This LLC was designed for residential construction purposes.
>
> The company's first plan of business is a Colonial style modular home to be constructed on 562 Elm Street in South Dartmouth, MA. We (the partners) have agreed to structure the project as a 50/50 split in profits, George Sebesta would receive an additional $325,000 for the land. Both partners will also be reimbursed for the expenses paid to construct the home to full completion (including all engineering plans, permits, excavation, water/sewer, electric, and any other job needed in order to completely finish the home). One accounting ledger shall be maintained from start of said project to the sale of the finished home. All expenses must be logged into said ledger along with the original receipt or invoice. A bank account will be established with $200, $100 from each partner.

It is signed by Peter Crane and George Sebesta.

The parties' agreement—both in those parts committed to writing and those that were not—was exceedingly spare. The parties did not address the extent to which each party would be responsible for contributing labor to the project without compensation. They did not address the priority in which the parties would be reimbursed for their contributions of land and funds to

---

[3] In their agreement to create the LLC, they refer to their newly formed entity as a partnership. It is unclear what kind of business entity they meant to create and did create. Their agreement plainly was not drafted by an attorney, and both parties are legally unsophisticated. Fortunately, for purposes of this proceeding, the Court need not determine precisely what kind of business entity they created.

4

the project should the property finally sell for less than those total contributions.  They failed to address the existing encumbrances against the Elm Street Property—the Gonsalls' mortgage and any other mortgage or lien that may have encumbered the property—and the extent, if any, to which Sebesta and Oiestad could further encumber the property before its ultimate conveyance, upon completion, to a third-party purchaser.  They also failed to obtain the agreement of Oiestad, a co-owner of the Elm Street Property, to their business plan.

Not least, they did not agree as to—or even discuss—how and when Sebesta would contribute the Elm Street Property to the project.  Sebesta never agreed to transfer the Elm Street Property, or any interest therein, either to the LLC or to Crane.  Their agreement required only that he contribute the property to the project.  It would have been wholly consistent with the parties' agreement if he merely transferred the property to a third-party purchaser upon completion of the project.  When he entered into the agreement and at all times thereafter, this was precisely his intention.

The parties commenced work on the project in April 2005, hoping to have it completed and the property sold by the end of the summer of 2005.  They wanted to take advantage of the summer selling season and of the fact that potential purchasers of homes in South Dartmouth were attracted by the schools and would be motivated to occupy or at least buy before the start of school in the fall.  The project met numerous delays and problems, was never fully completed, and, after Sebesta filed his bankruptcy petition in January 2007, was ultimately lost to foreclosure.

At all times through foreclosure, title to the Elm Street Property remained in the names of Sebesta and Oiestad as joint tenants.  Neither Sebesta nor Oiestad ever executed a writing to transfer title to or any interest in the Property to the LLC or to Crane.  Nor did either Sebesta or Oiestad ever purport to transfer their interest in the property to the LLC or to Crane by any means whatsoever.

In April 2005, Crane applied for a building permit, which he needed before he could order the modular home.  The permit was initially denied due to inadequacies in the engineering

5

plans but was finally issued in June 2005. In June, Crane solicited additional funds from his friend, Richard White ("White"), who provided a $100,000 loan to Crane and Sebesta under an agreement that he would be repaid $112,500 upon the sale of the modular home. Both Crane and Sebesta signed the promissory note to White; the obligation to White was unsecured. Crane then ordered the modular home.

In August 2005, the modular home was delivered to the property, and the two partners met with a realtor to discuss sale of the Elm Street Property as improved. The modular home needed significant interior work in order to obtain a certificate of occupancy from the town of South Dartmouth and be ready for sale. Late in August of that year, Crane returned to the football field and the classroom to resume his coaching and teaching duties, leaving him little time to work on the project. By this time, Crane had expended approximately $200,000 on the modular home with monies obtained by accessing his 401(k) account, dipping into the Crane Modular account,[4] and seeking additional funds from Richard White.

In August 2005 the interior remained empty and far from complete. There was no flooring or electricity, and the property remained unpainted. In addition, the basement was not fitted with a proper drainage system, as a result of which the house retained moisture that was causing the hardwood floors to buckle.

The relationship between Crane and Sebesta began to deteriorate during the fall of 2005, when the house remained unsuitable for occupancy or sale. Sebesta took his four employees from his home improvement business off other jobs and devoted them exclusively to finishing the construction of the Elm Street Property. During September and October 2005, Crane occasionally visited the house, but Crane stopped visiting the house from November through the spring of 2006. By this time, the funds available to Crane for financing the project had been depleted. Without further funding, work on the project came to a stop.

By January 2006, Sebesta understood that Crane had abandoned the project.

---

[4]The account was established by Crane for "Crane Modular," a business started by Crane to market and sell modular homes.

6

Sebesta's understanding was correct: for lack of time and resources, Crane had left him to finish the house on his own time and with his own resources. He asked Sebesta whether there was any way he (Sebesta) could raise funds available for completing the project. Sebesta, seeing no other way to complete the project, decided to refinance the property to secure the needed funds. He took over the "full responsibilities of the house" in order to prepare it for occupancy and sale.

Sebesta turned to lender U.S. Alliance for funding. U.S. Alliance granted Sebesta a construction loan for $444,500; to secure the loan, Sebesta and Oiestad gave U.S. Alliance mortgages on both the Elm Street Property and the Wilson Street Property. U.S. Alliance insisted on taking mortgages on both properties, not just the Elm Street Property, as a condition of issuing the loan. The mortgage on the Elm Street Property, which Sebesta signed as a "mortgagor," included the following language: "The mortgagor warrants . . . that it has good and marketable title in fee simple to the premises, subject to no lien, charge, or encumbrance . . . that it owns the property free and clear of all liens and claims." This is one of the statements that Crane contends constituted a false representation.

Of the total loan amount, $317,298 was disbursed to the Gonsalls to pay off the debt to them that was secured by mortgages on both properties; $34,250 was allocated to settlement costs and interest escrow—*i.e.*, to fund interest payments on the loan while the property remained under construction; $57,455 was held back for future construction costs; and approximately $35,500 was distributed directly to Sebesta himself. Sebesta used the $35,500 distribution to himself to finish the Elm Street Property, to continue renovations that were then in process on the Wilson Street Property, to pay off personal debts, and to aid Oiestad with her business expenses.

Though Crane had asked Sebesta to obtain funding for their project, Sebesta did not inform Crane of this transaction or of any of its details. Nor did he use any part of its proceeds to reimburse Crane for amounts he expended on the project or to repay any portion of White's loan to them.

7

At the time of the refinancing, Sebesta—who is not an attorney and by no means sophisticated in his understanding of property interests and their creation and conveyance—believed that Crane had no ownership interest in the property. He acknowledged that, by virtue of the business agreement between them, Crane had some right to control the disposition of that property, but at the same time he maintained—honestly and in good faith, I find—that Crane had no ownership interest in or lien on the Elm Street Property. He had good reason for this belief. He and Oiestad had not executed a deed of any kind to Crane. He and Oiestad remained personally liable for taxes on the property. The property remained encumbered by his debt to the Gonsalls (and later by the U.S. Alliance loan insofar as it merely replaced the debt to the Gonsalls). And he had not yet been paid the $325,000 that constituted the price for his contribution of the property to the venture. When he signed the mortgage and thereby warranted to U.S. Alliance that he and Oiestad had "good and marketable title in fee simple to the premises, subject to no lien, charge, or encumbrance" and that they "owned the property free and clear of all liens and claims," this was his honest belief. Sebesta had not read the mortgage before signing it and was unaware of this particular language within it. Nonetheless, he testified, he understood that in executing the mortgage he was somehow representing to U.S. Alliance that he and Oiestad alone were the owners of the Elm Street Property and were thus able to grant US Alliance a mortgage on it. I find that he did so honestly, with a good faith belief in the truth of this representation, and without intent to deceive U.S. Alliance. I further find that Crane has adduced no evidence that U.S. Alliance was injured by its reliance on this representation.

Later, in June 2006, Oiestad obtained a $75,000 loan from Quicken Loans, Inc. To secure this loan, Quicken Loans insisted on receiving mortgages on both the Wilson Street Property and the Elm Street Property. As Sebesta was a co-owner of both properties, Quicken Loans further insisted that he join in granting the mortgages. To help Oiestad, Sebesta obliged by joining Oiestad in granting a mortgage on both properties to secure the loan to Oiestad. The proceeds of this loan went to Oiestad exclusively, not to Sebesta or to fund the completion of

8

the Elm Street Property. Crane contends that, in signing the mortgage to Quicken Loans, Sebesta made a misrepresentation to Quicken Loans that Crane had no interest in the property; however, Crane has adduced no evidence as to this alleged representation.

Despite the January 2006 construction loan, the project was never fully completed. The parties presented no evidence as to the progress or lack thereof after the spring of 2006. However, it is clear that by this time, the parties' expectation of the price they could get for sale of the house had diminished considerably. They initially sought to market the property for between $650,000 and $699,000. In the fall of 2005, market conditions had changed dramatically, such that the marketing range was dropped to $399,000 to $450,000.

On January 5, 2007, Sebesta filed his bankruptcy petition. In February 2007, U.S. Alliance sought relief from the automatic stay to foreclose on the Elm Street Property on the basis that mortgage payments had been in default since October 2006. Relief was granted, and U.S. Alliance foreclosed on the Elm Street Property. The Court has no evidence of the amount for which it sold at foreclosure. However, the chapter 7 trustee filed a report of no distribution in the case, meaning there were no assets available for distribution to creditors and, one may surmise, no excess proceeds from sale of the Elm Street Property.

Crane contends that Sebesta breached their agreement by, among other things, placing the U.S. Alliance and Quicken Loans mortgages on the Elm Street Property and further by using the proceeds of the loans securing those mortgages for purposes other than funding of their business venture, the completion and sale of the Elm Street Property. He further contends that Sebesta obtained these two mortgages by use of false representations to the mortgagees, by which he concealed from them his (Crane's) interest in the property. Consequently, he concludes, any liability of Sebesta to Crane for damages arising from Sebesta's granting of these mortgages and use of the proceeds for private purposes should be excepted from discharge under § 523(a)(2)(A).

Has Crane established that he suffered damages from these actions? For the following reasons, I find that he has not. First, $317,298 of the U.S. Alliance loan was used merely to

replace an existing mortgage on the property with another. The replacement of one encumbrance by another did not worsen Crane's position. It merely replaced one mortgagee with another and thereby caused no harm.[5] Second, a substantial portion of the U.S. Alliance loan, over and above the amount that paid off the Gonsalls' mortgage, was used for improvements on the Elm Street Property. This includes most of the $31,167.50 that was allocated to settlement costs and interest escrow[6] and all of the $57,455 that was held back and eventually released for construction costs. These charges were undisputedly incurred for purposes of the joint venture and were necessary to its success, the parties having been unable to obtain this measure of financing on other terms. Together, these amounts bring the undisputedly legitimate portions of the U.S. Alliance mortgage to a principal amount of $405,920.50 (*i.e.*, the sum of the replaced mortgage, $317,298, the settlement costs and interest escrow, $31,167.50, and the construction costs, $57,455). Crane has not adduced evidence that, at the times when Sebesta placed the U.S. Alliance and Quicken Loan mortgages on the Elm Street Property, or at any time thereafter up to the time of foreclosure, the property had a value in excess of this amount. There is reason to believe it did not: the parties and their broker had reduced their sales price expectations to as little as $400,000. If the value did not exceed $405,920, then the fact that other proceeds of the U.S. Alliance

---

[5] It is possible that the terms of the replacement mortgages were less favorable to Crane's position than the original, but Crane does not so allege, and no evidence has been adduced to permit comparison of the terms of the original mortgage with the U.S. Alliance and Quicken Loan mortgages. I understand as well that Crane alleges that he has claims against Sebesta for failing to disclose the existing mortgage to him when they entered into the agreement. I make no finding on that issue but merely note that any such liability is separate and distinct from liability arising from the granting of the latter mortgages.

[6] The settlement costs and interest payments were proper because they were the cost of obtaining a loan that was necessary for completion of the Elm Street Property. However, the joint venture should not be charged with financing costs for the portion of the loan proceeds that Sebesta used for his own personal purposes. I cannot determine precisely how much this is. For present purposes, I will assume without finding that the entire $35,500 was used for personal purposes. This $35,500 constituted approximately nine percent of the total loan proceeds (excluding only the portion devoted to settlement and financing costs). Accordingly, I treat $31,167.50 (*i.e.*, 91 percent of the $34,250 interest and settlement costs) as an appropriate charge against the joint venture.

10

mortgage and the whole of the Quicken Loan mortgage may have been used for purposes that were in violation of the parties' agreement cannot have hurt the partnership. Where the legitimate portions of the mortgage were enough to consume all the equity in the property, any further encumbrance cannot have further encumbered equity that should have been available to the venture for reimbursement of expenses and investments. There simply was no further value in the property to divert. Absent evidence that the property was worth more than $405,920, Crane has not established that he was damaged by Sebesta's mortgagings of the property.

## IV.     Discussion

Crane having waived his counts under § 523(a)(4), only the counts under § 523(a)(2)(A) remain. In relevant part, section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud[.]" 11 U.S.C. § 523(a)(2)(A). Crane relies exclusively on alleged "false representations" and does not invoke the false pretenses or actual fraud language of this section. The complaint alleges three separate false representations that Crane contends could form the basis for a determination of nondischargeability: (i) Sebesta falsely represented to Crane that Crane would be fully reimbursed for all his expenses and that any profit realized would be equally split between the parties; (ii) Sebesta falsely represented to U.S. Alliance that he (Sebesta) was the sole owner of the Elm Street Property, which Crane maintains was property of the parties' "partnership"; and (3) Sebesta falsely represented to Quicken Loans that he (Sebesta) was the sole owner of the Elm Street Property.

A party seeking a determination of nondischargeability bears the burden of establishing by a preponderance of the evidence that a particular debt falls within § 523(a)(2)(A) and therefore should be excepted from discharge. *Grogan v. Garner*, 498 U.S. 279, 291 (1995). If the plaintiff fails to establish any one of the necessary elements of § 523(a)(2)(A), then the court should reject the plaintiff's claims. *Palmacci v. Umpierrez*, 121 F.3d 781, 787-88 (1st Cir. 1997).

11

To establish that a debt is nondischargeable under § 523(a)(2)(A) due to a false representation, the plaintiff must prove each of the following elements:

(1) the debtor made a false representation either knowingly or with reckless disregard for the truth;

(2) the debtor intended to deceive;

(3) the debtor intended to induce the creditor to rely upon the false statement;

(4) the creditor actually relied upon the misrepresentation;

(5) the creditor's reliance was justifiable; and

(6) the reliance upon the false statement caused damage (pecuniary loss).

*McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001); *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997). Mere negligence is insufficient to prove actual fraud. *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997). Intent can rarely be proven by direct evidence; therefore, in attempting to discern it, the court should consider the totality of the circumstances. *Palmacci v. Umpierrez*, 121 F.3d 781, 790 (1st Cir. 1997). I now turn to the alleged false representations.

### a.   False Promises to Crane

The first is that Sebesta falsely represented to Crane that Crane would be fully reimbursed for all his expenses and that any profit realized would be equally split between the parties. By this I do not understand Crane to be contending that Sebesta made predictions of future events that turned out to be wrong. Nor do I understand him to be merely alleging that Sebesta made a promises that he later breached. Representations of those natures would not be excepted from discharge under subsection (a)(2)(A). Rather, I understand him to be alleging that Sebesta made promises to Crane—to reimburse him for his expenses and to share profits equally—without intent to honor those promises; a representation of that nature does fall within the scope of subsection (a)(2)(A) as a false representation of the maker's intent.

In order to prevail on this count, Crane must prove, among other things, (i) that Sebesta

12

Document      Page 13 of 16

made the promises in question and (ii) that he did so without intent to honor them. I find that Sebesta did not make precisely the promises alleged. He did not promise Crane that his expenses would be reimbursed in full. Rather, he promised that from the proceeds of the property, each party would be reimbursed for the expenses each incurred to bring the project to completion, and he further promised that after payment of $325,000 to Sebesta for the property and each party's expenses, the parties would share the profits equally. Sebesta made these promises when he entered into his business agreement with Crane. I further find that when he made these promises, Sebesta fully intended to keep them. He did not falsely represent his intent. Accordingly, Crane is entitled to no relief on this count.

      b.      **False Warranty to U.S. Alliance**

Next Crane alleges that Sebesta, in a warranty contained in his mortgage to U.S. Alliance, falsely represented to U.S. Alliance that he (Sebesta) was the sole owner of the Elm Street Property, which Crane maintains was false, it being his position that the Elm Street Property belonged to their "partnership." In this count for a determination that his own claim is excepted from discharge, Crane is relying on a false representation that was not made to Crane or to induce Crane to rely on it. Rather, the representation in question was made to a third party. Whether the representation was false or not, it was not made to induce Crane to rely on it. The Court has serious reservations about this novel strategy under § 523(a)(2)(A). However, because I find that, even if this difficulty is not dispositive, this count would fail for several other reasons, the Court need not address it here.

This count fails for the following reasons. First, the representation was not false. In order to prevail on this count, Crane would have to establish that Sebesta and/or Oiestad somehow conveyed to him, or to the parties' "partnership," an interest in the real property. Nowhere in his posttrial brief does Crane address this issue. In Massachusetts as elsewhere, the conveyance of an interest in real property requires a writing, but Sebesta executed no such

writing.[7] The writing memorializing their agreement was not in any sense a deed. In it the parties stated that Sebesta "would receive . . . $325,000 for the land," but they included no other language concerning Sebesta's obligations with respect to conveyance of the property. The timing and manner of his contribution of the land were not specified, and that document certainly did not itself purport to be an instrument of conveyance. I find no basis on which to conclude that Crane or any business entity formed by Crane or Sebesta had acquired an interest in the Elm Street Property. Nor was Sebesta, much less Oiestad, even obligated by the parties' agreement—certainly not by their written agreement and not even by those portions of their agreement not reduced to writing—to convey an interest in the property to Crane or their business entity.[8] Their agreement simply did not require transfer by Sebesta other than to the ultimate third-party purchaser of the developed property.

Second, in order to prevail on this count, Crane would have to prove that Sebesta knew the statement to be false or that he made it in reckless disregard of the truth. He has proven neither. Sebesta believed in good faith and with good reason that title remained in himself and Oiestad.

Third, in order to prevail on this count, Crane must prove that Sebesta made the statement with intent to deceive U.S. Alliance. He did not make it with such intent.

Fourth, in order to prevail on this count, Crane must show that U.S. Alliance suffered harm from its reliance on his representation. Crane has made no such showing.

Fifth, and insofar as it may be relevant to this unusual count under § 523(a)(2)(A), Crane has not even shown that Sebesta's inducement of U.S. Alliance to give him a loan secured by a

---

[7] G.L. c. 183, § 3 ("An estate or interest in land created without an instrument in writing signed by the grantor or by his attorney shall have the force and effect of an estate at will only, and no estate or interest in land shall be assigned, granted or surrendered unless by such writing or by operation of law.").

[8] G.L. c. 259, § 1 ("No action shall be brought . . . [u]pon a contract for the sale of lands, tenements or hereditaments or of any interest in or concerning them . . . [u]nless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized.").

14

mortgage caused any injury to Crane.

### c. False Statement to Quicken Loans

Next Crane alleges that Sebesta falsely represented to Quicken Loans that he (Sebesta) was the sole owner of the Elm Street Property.  This count appears to be virtually identical to the count based on the warranty to U.S. Alliance.  Consequently, it fails for the same reasons, which I need not reiterate here.  This count also fails for the further reason that Crane has nowhere identified or adduced evidence of the specific representation on which this count is predicated.

### d. False Statement to Quicken Loans

In his posttrial brief, Crane for the first time adds a new false statement to those identified in the complaint.  Specifically, he contends that Sebesta "made a continuing false representation to Plaintiff when he continued to induce Plaintiff to act as a partner and co-owner of the property at the same time he was taking a different position with the lending bank."  This alleged false representation cannot now form the basis for a determination of nondischargeability because Sebesta was given no notice of it before trial.  Fraud, including false representations, must be plead with particularity in order to afford the defendant an understanding of precisely what he must defend against.  *See* FED. R. CIV. P. 9(b).  Here Sebesta was afforded no notice that this alleged representation would constitute a basis for relief against him.

This count also fails for two additional reasons.  First, even in his posttrial brief, Crane has not specified the statements or actions with which he contends Sebesta "continued to induce [him] to act as a partner and co-owner of the property."  The first requirement of a false representation under 523(a)(2)(A) is identification of the representation in question and proof that it was made; Crane has done neither.

Second, Crane has adduced no evidence that he relied on these alleged inducements to

15

his detriment. He has not satisfied his burden as to this element. The alleged inducements, whatever they consisted of, must have occurred during or after January 2006. It was in that month that Sebesta first met with U.S. Alliance; there is no evidence that before this time Sebesta "was taking a different position with the lending banks." However, by this time Crane had already committed all the resources to the project that he ever did commit. He had by then run out of resources, which is what made the U.S. Alliance mortgage necessary. Crane has not established that, in reliance on these alleged urgings, he in any way changed his position. At most the alleged urgings may have caused him to have false hope or expectations. The entertainment of false hopes without more is not detrimental reliance.

**V.     Conclusion**

For the reasons set forth above, the Court finds that Crane has failed to establish cause to except his as-yet unliquidated claims, or any part thereof, from discharge. By separate order, the court will dismiss his complaint with prejudice.

Date: July 16, 2010

_____
Frank J. Bailey
United States Bankruptcy Judge

16